UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| AMAZON.COM, INC., et al., | No. 2:22-cv-01491 DJC AC |
| Plaintiffs, | |
| v. | ORDER and |
| PIONERA INC. and MANOJ GOEL, | FINDINGS AND RECOMMENDATIONS |
| Defendants. | |

This matter is before the court on plaintiffs' motion for default judgment against both defendants. ECF No. 15. The motion was referred to the undersigned pursuant to E.D. Cal. R. 302(c)(19). Defendant Manoj Goel, an individual, appeared in pro se and opposed entry of default judgment in the form of a Motion to Dismiss. ECF No. 18. The court held a hearing on May 24, 2023. ECF No. 29. The court explained to Goel that he could appear on behalf of himself but that the corporate entity, Pionera Inc., must be represented by counsel. Id. The court issued a minute order vacating the entry of default against Goel and indicating it would withhold ruling on the motion for default judgment for 30 days to give Goel an opportunity to find counsel for the corporate entity. ECF No. 29. On June 14, 2023, Goel submitted a document indicating he was unable to find counsel to represent the corporate entity and had given up searching for counsel. ECF No. 30.

////

1

The court construes plaintiff's motion to dismiss (ECF No. 18) as an opposition to the entry of default judgment against him. Because entry of default against Goel has been vacated and because Goel has opposed entry default judgment and affirmatively demonstrated an intent to defend, the motion for default judgment must be DENIED without prejudice as to Goel. However, for the reasons set forth below, the recommends plaintiffs' motion be GRANTED in part and that default judgment be entered against the corporate defendant Pionera, Inc.

**I.     Allegations of the Complaint**

Plaintiff, Amazon Inc, and its subsidiary, Ring LLC, brought this lawsuit against defendants Pionera Inc., and Manoj Goel. Plaintiffs allege as follows. Amazon and Ring each provide free customer support for their products and services, including activation support for Amazon Prime Video and Ring security systems. ECF No. 1 at 2. Defendants target customers seeking support for Prime Video and Ring security systems with misleading websites that deceive customers to believe they are interacting directly with Amazon or Ring. Id. The purpose of defendants' actions is to obtain payments from consumers for unnecessary and sometimes even fabricated tech support services. Id. Defendants charge victims for tech support services that Amazon provides for free. Id. Defendants' actions undermine customer trust in Amazon and Ring by providing false and misleading information to customers about Amazon and Ring's products and services, and confuse customers and interfere with the expected customer experience with Amazon and Ring's genuine products and services. Id.

A. Impersonation of Ring Support Services

Plaintiffs own several trademark registrations under their "Ring" brand ("Ring Marks"). ECF No. 5. Per the complaint, defendants Pionera and Goel control and operate at least two websites that falsely claim to offer Ring setup and tech services and purport to be formally associated with Ring. ECF No. 1 at 7-8. On September 29, 2021, an investigator called a phone number listed on both websites and left a voicemail requesting support for a Ring device. Id. at 12. The investigator ultimately reached someone identifying themselves as "John from Ring Support," who said he could provide support services for a one-time charge of $99.99 to update the firmware and security of the Ring Doorbell. Id. Ring does not charge for customer support to

help setup Ring devices, or to update a device's firmware. Id.

The investigator agreed to the $99.99 charge, and "John from Ring Support" directed the investigator to "secure.logmeinrescue.com" where John told the investigator to enter the access code 398691. Id. The investigator entered the code, which prompted the remote access tool LogMeIn Rescue to download on the investigator's computer and allowed John to access the investigator's computer remotely. Id. "John from Ring Support" next asked if the investigator had a Ring Doorbell account and, when the investigator said he did not, John used his remote access to the investigator's computer to direct the investigator to Ring's official site at www.ring.com. Id. John clicked on the website's login hyperlink and created a new Ring account for the investigator. Id.

"John from Ring Support" next directed the investigator to complete a PayPal payment form for a $99.99 charge for "IT Services" from a billing account registered to "SHIKHA CHAUDHARY." The investigator paid the invoice with a credit card and received a copy of a paid invoice. Id. at 14. After the payment was processed, "John from Ring Support" informed the investigator that the call would be ended, but after ending the call John performed two acts on the investigator's computer without informing the investigator: (1) ran a continuous ping of the IP address 142.250.190.4 (Google Cloud); and (2) opened the Microsoft Malicious Software removal tool and ran a full scan for malicious software. Id.

"John from Ring Support" then called the investigator back. Id. John pulled up a YouTube video and asked the investigator to follow the instructions on the video to reset the Ring Doorbell camera, and while the video was playing, John attempted to access the investigator's computer camera without explaining why. Id. Once the YouTube video concluded, "John from Ring Support" created a .TXT file on the investigator's computer with his full name ("John Peterson"), a phone number, and a merchant ID. Id. at 15. "John from Ring Support" then opened the investigator's Window's Security settings and dismissed the computer's "Virus & threat protection," "Account protection," and "App & browser control" warnings, and ended the call. Id. None of the steps "John from Ring Support" took on the investigator's computer updated the firmware or security of the investigator's Ring device. Id.

An investigator initiated a second test purchase on October 22, 2021 by dialing a phone number listed on both of defendants' websites as well as the website "ringcamsupport.blogspot.com." Id. at 15-16. The investigator reached a person who identified himself as "Paul Daniels" from "Ring Support." Id. at 16. At Paul's request, the investigator provided a model number for the investigator's Ring device, and was told the item's software was corrupted, its warranty was expired, and falsely claimed that the device was "registered under the name Janet Rose," when it was not. Id. "Paul from Ring Support" told the investigator that he could fix the investigator's Ring device for a one-time charge of $50.00. Id. Paul stated that he would need to connect to the investigator's computer to upload software and to update the firmware and security of the device and instructed the investigator to install LogMeIn Rescue. Id. at 17. After completing the installation the investigator received a notification that "PIONERA INCORPORATIONS" had established a remote connection with his computer. Id.

"Paul from Ring Support" took control of the investigator's computer, navigated to supremocontrol.com, and clicked on a "Download" icon, which caused the remote access tool Supremo to download. Id. at 18. When the investigator asked Paul what he was downloading, Paul stated, "it is additional security and firewall that will help get your doorbell connected." The investigator was instructed to complete payment through a PayPal invoice from "Akash Kumar," which he paid. Id. The investigator received a confirmation of payment referencing an address in India. Id. at 19. After the investigator's payment, "Paul from Ring Support" reported that "I was just able to connect your doorbell to the Ring server." Id. Paul then opened a Notepad document on the investigator's computer and entered the following text: "TollFree No: 1-800-841-6516; Technician name: John Peterson; Case Id: PD200586; Merchant: Ring/IT Service"—the same name and phone number provided during the First Test Purchase. Id.

Following this interaction, the investigator received a call from a person identifying themselves as "John Peterson" front "Ring support." Id. at 20. Using his remote control of the investigator's computer, "John from Ring Support" accessed a video created by Ring on YouTube. Id. at 21. When the video was over, John told the investigator that the "firewall and security are now installed" on the investigator's Ring device. Id. Neither John nor Paul installed

4

any software, firmware, or security updates the investigator's Ring device, despite having falsely claimed to do so. Id.

B. Fraudulent Activation Fee for Prime Video

The complaint further alleges that defendants mislead and confuse Prime Video customers by diverting them from the genuine activation process through deceptive messaging and false claims that an error occurred during activation. ECF No. 1 at 21. The message prompts victims to call a phone number connected to defendants, and once connected defendants make false claims about the status of the consumers' Prime Video accounts. Id. Defendants deceive consumers into believing they need to pay a fee to activate Prime Video on their devices. Id. Defendants use this tactic to sell unnecessary services to Amazon's customers. Id.

## II. Motion

Plaintiffs seek judgment against defendants for $1,100,000 in statutory damages for trademark infringement and cybersquatting under the Lanham Act. ECF No. 15 at 10. Plaintiffs also request a permanent injunction prohibiting defendants from continuing to harm plaintiffs' customers and brands. Defendant Pionera Inc. has not appeared or filed any response. ECF No. 30. Defendant Goel filed a document construed as an opposition to entry of default judgment, which does not substantively oppose the motion but argues that judgment should not be entered against him because Goel was only a 20% owner in Pionera, the company was officially closed in 2022, and that Goel "does not have the money to fight Amazon lawyers and can't afford an attorney." ECF No. 18 at 1.

## III. Analysis

A. Legal Standard

Pursuant to Federal Rule of Civil Procedure 55, default may be entered against a party against whom a judgment for affirmative relief is sought who fails to plead or otherwise defend against the action. See Fed. R. Civ. P. 55(a). However, "[a] defendant's default does not automatically entitle the plaintiff to a court-ordered judgment." PepsiCo, Inc. v. Cal. Sec. Cans, 238 F.Supp.2d 1172, 1174 (C.D. Cal. 2002) (citing Draper v. Coombs, 792 F.2d 915, 924-25 (9th Cir. 1986)); see Fed. R. Civ. P. 55(b) (governing the entry of default judgments). Instead, the

5

decision to grant or deny an application for default judgment lies within the district court's sound discretion. Aldabe v. Aldabe, 616 F.2d 1089, 1092 (9th Cir. 1980). In making this determination, the court may consider the following factors:

> (1) the possibility of prejudice to the plaintiff; (2) the merits of plaintiff's substantive claim; (3) the sufficiency of the complaint; (4) the sum of money at stake in the action; (5) the possibility of a dispute concerning material facts; (6) whether the default was due to excusable neglect; and (7) the strong policy underlying the Federal Rules of Civil Procedure favoring decisions on the merits.

Eitel v. McCool, 782 F.2d 1470, 1471-72 (9th Cir. 1986). Default judgments are ordinarily disfavored. Id. at 1472.

As a general rule, once default is entered, well-pleaded factual allegations in the operative complaint are taken as true, except for those allegations relating to damages. TeleVideo Sys., Inc. v. Heidenthal, 826 F.2d 915, 917-18 (9th Cir. 1987) (per curiam) (citing Geddes v. United Fin. Group, 559 F.2d 557, 560 (9th Cir. 1977) (per curiam)); see also Fair Housing of Marin v. Combs, 285 F.3d 899, 906 (9th Cir. 2002). Although well-pleaded allegations in the complaint are admitted by a defendant's failure to respond, "necessary facts not contained in the pleadings, and claims which are legally insufficient, are not established by default." Cripps v. Life Ins. Co. of N. Am., 980 F.2d 1261, 1267 (9th Cir. 1992) (citing Danning v. Lavine, 572 F.2d 1386, 1388 (9th Cir. 1978)); accord DIRECTV, Inc. v. Huynh, 503 F.3d 847, 854 (9th Cir. 2007) ("[A] defendant is not held to admit facts that are not well-pleaded or to admit conclusions of law") (citation and quotation marks omitted); Abney v. Alameida, 334 F.Supp.2d 1221, 1235 (S.D. Cal. 2004) ("[A] default judgment may not be entered on a legally insufficient claim."). A party's default conclusively establishes that party's liability, although it does not establish the amount of damages. Geddes, 559 F.2d at 560; cf. Adriana Int'l Corp. v. Thoeren, 913 F.2d 1406, 1414 (9th Cir. 1990) (stating in the context of a default entered pursuant to Federal Rule of Civil Procedure 37 that the default conclusively established the liability of the defaulting party).

B. The Eitel Factors

   1. Factor One: Possibility of Prejudice to Plaintiff

The first Eitel factor considers whether the plaintiff would suffer prejudice if default

judgment is not entered, and such potential prejudice to the plaintiff weighs in favor of granting a default judgment. See PepsiCo, Inc., 238 F.Supp.2d at 1177. Here, plaintiffs would suffer prejudice if the court did not enter a default judgment because they would be without recourse for recovery. Goel's filings have made it clear that Pionera, Inc. is not going to defend itself or participate in this action. As explained to Goel at the hearing on the motion, "[a] corporation must be represented by counsel." Reading Int'l, Inc. v. Malulani Grp., Ltd., 814 F.3d 1046, 1053 (9th Cir. 2016). Goel has confirmed that Pionera will not appear through counsel, and will therefore not defend itself. ECF No. 30. Accordingly, the first Eitel factor favors the entry of default judgment.

2. Factors Two and Three: Merits of Claims and Sufficiency of Complaint

The merits of plaintiffs' substantive claims and the sufficiency of the complaint are considered here together because of the relatedness of the two inquiries. The court must consider whether the allegations in the complaint are sufficient to state a claim that supports the relief sought. See Danning, 572 F.2d at 1388; PepsiCo, Inc., 238 F.Supp.2d at 1175. Here, the merits of the claims and sufficiency of the complaint favor entry of default judgment. Plaintiffs move for entry of default judgment on two causes of action, both covered under the Lanham Act: (1) trademark infringement and (2) cybersquatting. ECF No. 15 at 18-20.

a. Trademark infringement

To state a claim for trademark infringement, the complaint must allege that the plaintiff: "(1) ...has a protectable ownership interest in the mark; and (2) that the defendant's use of the mark is likely to cause consumer confusion, thereby infringing upon the [plaintiff's] rights to the mark." Department of Parks and Recreation for State of California v. Bazaar Del Mundo Inc., 448 F.3d 1118, 1124 (9th Cir. 2006); see also Multi Time Machine, Inc. v. Amazon.com, Inc., 804 F.3d 930, 935 (9th Cir. 2015) ("To prevail on a claim of trademark infringement under the Lanham Act, a trademark holder must show that the defendant's use of its trademark is likely to cause confusion, or to cause mistake, or to deceive."). "The test for likelihood of confusion is whether a 'reasonably prudent consumer' in the marketplace is likely to be confused as to the origin of the good or service bearing one of the marks." Dreamwerks Production Group, Inc. v.

SKG Studio, 142 F.3d 1127, 1129 (9th Cir. 1998).  In evaluating the likelihood of confusion, the court employs an eight factor test.  See AMF Inc. v. Sleekcraft Boats, 599 F.2d 341, 348-49 (9th Cir. 1979), abrogated on other grounds by Mattel, Inc. v. Walking Mountain Prod., 353 F.3d 792, 810 n.19 (9th Cir. 2003).

Here, plaintiff has made the requisite allegation of protectable ownership in its complaint and supported the allegation with sufficient evidence.  Plaintiffs have provided the registrations for each infringed trademark.  ECF No. 1 at ¶¶ 17-18; MacNaughton Decl., Exs. B at 1-2 & C at 1-2.  This uncontested proof of registration establishes plaintiff's protected ownership interest.  See, Pom Wonderful LLC v. Hubbard, 775 F.3d 1118, 1124 (9th Cir. 2014).  Plaintiff also successfully addresses each factor of the Sleekcraft test for likelihood of confusion: (i) strength of the mark; (ii) proximity of the goods; (iii) similarity of the marks; (iv) evidence of actual confusion; (v) marketing channels used; (vi) type of goods and degree of care likely to be exercised by the purchaser; (vii) defendant's intent in selecting the mark; and (viii) likelihood of expansion of the product lines.  See Sleekcraft, 599 F.3d at 348-49.  The court now addresses these factors in turn.

*(i)     Strength of the mark*

A "strong," or distinctive, mark is afforded greater protection under trademark law than a mark that is not strong.  See, e.g., Sutter Home Winery, Inc. v. Madrona Vineyards, L.P., No. C 05-0587 MHP, 2005 WL 701599, *8 (N.D. Cal. Mar. 23, 2005) ("The strength of protection afforded to a trademark is proportionate to the likelihood that the public will remember the mark and associate it with the source of the trademarked goods" (citations omitted)).  When evaluating the strength of a mark, courts consider both conceptual and commercial strength.  Id.

The conceptual strength of a mark "is determined by its placement on a continuum of marks from 'generic,' afforded no protection; through 'descriptive' or 'suggestive,' given moderate protection; to 'arbitrary' or 'fanciful' awarded maximum protection."  E. & J. Gallo Winery, 967 F.2d at 1291 (quoting Nutri/System, Inc. v. Con-Stan Industries, Inc., 809 F.2d 601, 605 (9th Cir. 1987) (quotation marks omitted)).  The nature of a mark is determined by the "imagination test" and a "need test."  Id. (citing Earthquake Sound Corp. v. Bumper Industries,

352 F.3d 1210, 1221 n. 4 (9th Cir. 2003)).  Using the "imagination test" the court asks how much imagination a consumer must use to associate a given mark with the goods or services it identifies, and using the "need test" the court examines the extent to which competitors need a mark to identify their goods or services.  Earthquake Sound Corp., 352 F.3d at 1221 n. 4 (quoting Miss World (UK) Ltd. v. Mrs. America Pageants, Inc., 856 F.2d 1445, 1449 (9th Cir. 1988)).

       The marks at issue include  (1) registered Mark No. 5,808,247 ("Ring Word Mark"), which is identified as the word "RING" in standard characters and recorded for use in Plaintiffs' customer service activities, see Declaration of Bonnie MacNaughton ("MacNaughton Decl."), Ex. B at 1, and (2) registered Mark No. 5,776,163 ("Ring Logo Mark"), which is identified as the stylized rendering of the word "RING," Id., Ex. C at 1.  Applying the tests above, the court finds that the marks are entitled to at least moderate protection as "suggestive" marks, and that plaintiffs have demonstrated the marks have significant commercial strength.  ECF No. 15 at 16. 18-20.  This factor weighs in favor of finding a likelihood of confusion.

       *(ii)     Proximity of the goods*

       Plaintiffs have submitted information indicating that defendants are using exact copies of the marks at issue on their websites, which were designed to impersonate websites operated by or affiliated with plaintiffs to deceive customers and trick them into paying for defendants' unnecessary services.  ECF No. 1 at  ¶¶ 23, 28-43, 50-60; Bargar Decl. ¶¶ 3-7; Mello Decl. ¶¶ 3-10.  This factor weighs heavily in favor of finding a likelihood of confusion.

       *(iii)    Similarity of the marks*

       The "similarity of the marks" portion of the Sleekcraft test "is the most crucial factor in determining the likelihood of confusion."  Sutter Home Winery, Inc., 2005 WL 701599 at *5.  Here, as discussed above, defendants are using exact replicas of the marks at issue.  This factor weighs strongly in favor of finding a likelihood of confusion.

       *(iv)    Evidence of actual confusion*

       While evidence of actual confusion is not necessary to prevail on an infringement claim or to secure injunctive relief, it can provide persuasive evidence that future confusion is likely.  See Academy of Motion Picture Arts & Sciences v. Creative House Promotions, Inc., 944 F.2d 1446,

1456 (9th Cir. 1991). Plaintiffs have not submitted evidence of actual confusion, nor have they they demonstrated a risk of future confusion. This factor weighs against finding a likelihood of confusion.

     *(v) Marketing channels used*

Because both plaintiffs and defendants advertise and apparently conduct their business largely online, there is significant marketing channel overlap in this case. "In the Internet context, in particular, entering a web site takes little effort—usually one click from a linked site or a search engine's list; thus, Web surfers are more likely to be confused as to the ownership of a web site than traditional patrons of a brick-and-mortar store would be of a store's ownership." Brookfield Commc'ns, Inc. v. W. Coast Entm't Corp., 174 F.3d 1036, 1057 (9th Cir. 1999). This factor weighs in favor of finding a likelihood of confusion.

     *(vi) Type of goods and degree of care likely to be exercised by the purchase*

The fact that this dispute centers on services provided online increases the likelihood of confusion. "Navigating amongst web sites involves practically no effort whatsoever, and arguments that Web users exercise a great deal of care . . . are unconvincing." GoTo.com, Inc. v. Walt Disney Co., 202 F.3d 1199, 1209 (9th Cir. 2000). This factor weighs in favor of finding a likelihood of confusion.

     *(vii) Defendant's intent in selecting the mark*

As discussed above, plaintiffs' allegations demonstrate that defendants intentionally interacted consumers through use of plaintiffs' marks with the intent of impersonating plaintiffs to defraud consumers. This factor favors finding a likelihood of confusion.

     *(viii) Likelihood of expansion of product lines*

This factor evaluates whether a parties' product line is likely to expand to create competition; where the parties are already in direct competition with one another, this factor is not relevant. See, e.g., Au-Tomotive Gold, Inc. v. Volkswagen of America, Inc., 457 F.3d 1062, 1078 n. 12 (9th Cir. 2006) ("The final factor, '[a] likelihood of expansion in product lines,' warrants no discussion as it is 'relatively unimportant where two companies already compete to a significant extent,' " quoting Brookfield Communications, 174 F.3d at 1060). Based on a review

10

of the entire record, plaintiff has demonstrated protectable ownership in the marks and a likelihood of confusion stemming from defendant's unauthorized use. Accordingly, the second and third Eitel factors are satisfied as to the claim of trademark infringement.

        b.   Cybersquatting

To prevail on a claim for cyberpiracy, plaintiff must prove that "(1) the defendant registered, trafficked in, or used a domain name; (2) the domain name is identical or confusingly similar to a protected mark owned by the plaintiff; and (3) the defendant acts with 'bad faith intent to profit from that mark.'" DSPT Int'l, Inc. v. Nahum, 624 F.3d 1213, 1218–19 (9th Cir.2010) (quoting 15 U.S.C. § 1125(d)(1)(A)). As discussed above, plaintiff has alleged and produced evidence that defendants used the domain ringssupport.com, which uses the Ring Word Mark in a confusing manner that created the impression that defendants' website was a legitimate source of customer support for plaintiffs' customers. Plaintiffs produced two affidavits from investigators in which the investigators state that defendants, though this domain and phone numbers contained thereon, sold unnecessary technology support services while posing as plaintiffs' employees. See Bargar Decl. and Mello Decl.. This factor weighs strongly in favor of default judgment.

        3.   Factor Four: The Sum of Money at Stake in the Action

Under the fourth Eitel factor, the court considers the amount of money at stake in relation to the seriousness of defendant's conduct. Courts have held that where a plaintiff seeks only injunctive relief from the continued use of their trademarks, this factor favors entry of default judgment. PepsiCo, Inc., 238 F. Supp. 2d at 1176–77. Here, plaintiff statutory damages and injunctive relief. The amount at issue is proportionate to the seriousness of defendant's conduct and this factor favors entry of default judgment.

        4.   Factor Five: Possibility of Dispute Concerning Material Facts

The facts of this case are relatively straightforward, and plaintiff has provided the court with well-pleaded allegations supporting its claims and affidavits in support of its allegations. Here, the court may assume the truth of well-pleaded facts in the complaint (except as to damages) following the clerk's entry of default and, thus, there is no likelihood that any genuine

issue of material fact exists.  See, e.g., Elektra Entm't Group Inc. v. Crawford, 226 F.R.D. 388, 393 (C.D. Cal. 2005) ("Because all allegations in a well-pleaded complaint are taken as true after the court clerk enters default judgment, there is no likelihood that any genuine issue of material fact exists."); accord Philip Morris USA, Inc., 219 F.R.D. at 500; PepsiCo, Inc., 238 F.Supp.2d at 1177.

### 5. Factor Six: Whether Default Was Due to Excusable Neglect

Upon review of the record before the court, there is no indication that the default was the result of excusable neglect.  See PepsiCo, Inc., 238 F.Supp.2d at 1177.  Indeed, the individual plaintiff Goel has affirmatively stated on the record that the corporate defendant Pionera does not intend to appear and defend itself.  ECF No. 30.  Accordingly, this Eitel factor favors the entry of a default judgment.

### 6. Factor Seven: Policy Favoring Decisions on the Merits

"Cases should be decided upon their merits whenever reasonably possible."  Eitel, 782 F.2d at 1472.  However, district courts have concluded with regularity that this policy, standing alone, is not dispositive, especially where a defendant fails to appear or defend itself in an action.  PepsiCo, Inc., 238 F.Supp.2d at 1177; see also Craigslist, Inc. v. Naturemarket, Inc., 694 F.Supp.2d 1039, 1061 (N.D. Cal. Mar. 5, 2010).  Accordingly, although the court is cognizant of the policy favoring decisions on the merits – and consistent with existing policy would prefer that this case be resolved on the merits – that policy does not, by itself, preclude the entry of default judgment.

### 7. Conclusion: Propriety of Default Judgment

Upon consideration of all the Eitel factors, the court concludes that plaintiff is entitled to the entry of default judgment against the corporate defendant.  What remains is the determination of the amount of damages to which plaintiff is entitled.

## C. Terms of Judgment

### 1. Injunctive Relief

Plaintiffs' motion for default judgment includes a request for a permanent injunction.  ECF No. 15 at 26.  15 U.S.C. § 1116(a) provides that a district court has the "power to grant

injunctions, according to the principles of equity and upon such terms as the court deems reasonable, to prevent the violation of any right of the registrant of a mark registered in the Patent and Trademark Office." A permanent junction may be granted where the plaintiff demonstrates: "(1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." eBay Inc. v. MercExchange, L.L.C., 547 U.S. 388, 391 (2006).

"Injunctive relief is the remedy of choice for trademark and unfair competition cases, since there is no adequate remedy at law for the injury caused by a defendant's continuing infringement." Century 21 Real Estate Corp. v. Sandlin, 846 F.2d 1175, 1180 (9th Cir. 1988). Moreover, "once the plaintiff establishes a likelihood of confusion, it is ordinarily presumed that the plaintiff will suffer irreparable harm if injunctive relief is not granted." Vision Sports, Inc. v. Melville Corp., 888 F.2d 609, 612 n.3 (9th Cir. 1989). And "the public has an interest in the enforcement of federal statutes." CoxCom, Inc. v. Chaffee, 536 F.3d 101, 112 (1st Cir. 2008). Because there is no hardship to the defendant in enjoining defendant from using an identical mark to plaintiff's registered mark, the court recommends that plaintiffs be awarded a permanent injunction.

### 2. Trademark Violation Statutory Damages

Plaintiffs also seek an award of statutory damages under the Lanham Act consisting of $500,000 in statutory damages—totaling $1 million—for each of defendants' willful infringements of two of plaintiffs' Marks: (1) the term "RING" as a Standard Character Mark; and (2) the term "RING" displayed as a Stylized mark. ECF No. 15 at 24. Plaintiffs also seek $100,000 in statutory damages for defendants' cybersquatting violation by their use of the domain ringssupport.com. Under the Lanham Act, a court may award statutory damages in an amount of "not less than $1,000 or more than $200,000 per counterfeit mark per type of goods or services sold, offered for sale, or distributed, as the court considers just." Id. § 1117(c)(1). "[I]f the court finds that the use of the counterfeit mark was willful, [the Court may award] not more

than $2,000,000 per counterfeit mark per type of goods or services sold, offered for sale, or distributed, as the court considers just." Id. § 1117(c)(2). "In determining the appropriate amount of statutory damages to award on default judgment, courts in this district have considered whether the amount of damages requested bears a plausible relationship to [a p]laintiff's actual damages." Yelp Inc. v. Catron, 70 F. Supp. 3d 1082, 1102 (N.D. Cal. 2014) (internal quotation marks and citations omitted). "While a plaintiff in a trademark or copyright infringement suit is entitled to damages that will serve as a deterrent, it is not entitled to a windfall." Id.

Plaintiffs have not established that an award of $500,000 per infringed mark is reflective of the actual damages sustained by plaintiffs. Though plaintiffs put forth affidavits from investigators, they did not put forth any evidence of actual confusion in the marketplace, or any concrete damages regarding reputational harm. ECF No. 15 at 25. Plaintiffs' allegations regarding the general impact of fraudulent schemes creating reputational harm are not enough; the undersigned agrees with other courts that have found, in similar situations, that plaintiffs' goodwill-based damages support a reduced award from the one requested. See, e.g., Amazon.com, Inc. v. Expert Tech Rogers Pvt. Ltd., No. 20-cv-07405-PJH-JSC, 2021 WL 4461601, at *9 (N.D. Cal. Sept. 22, 2021), report and recommendation adopted, No. 20-CV-07405-PJH, 2021 WL 4896120 (N.D. Cal. Oct. 20, 2021) (awarding $200,000 in statutory damages per mark in default judgment). Based on the totality of the circumstances of this case, the undersigned finds statutory damages of $200,000 per mark, a total of $400,000, to be an appropriate award.

### 3. Cybersquatting Statutory Damages

Plaintiffs also seek $100,000 in statutory damages for defendants' use of the domain ringssupport.com in violation of 15 U.S.C. § 1125(d). ECF No. 15 at 26. Under 15 U.S.C. § 1117(d), plaintiffs can be awarded between $1,000 and $100,000 per domain name, as the court considers just. To determine cybersquatting statutory damages in the default judgment context, "courts generally consider a number of factors ... including the egregiousness or willfulness of the defendant's cybersquatting, the defendant's use of false contact information to conceal its infringing activities, the defendant's status as a "serial" cybersquatter—i.e., one who has engaged

14

in a pattern of registering and using a multitude of domain names that infringe the rights of other parties—and other behavior by the defendant evidencing an attitude of contempt towards the court or the proceedings. Digby Adler Grp. LLC v. Image Rent a Car, Inc., 79 F. Supp. 3d 1095, 1108 (N.D. Cal. 2015) (citation omitted); see 15 U.S.C. § 1125(d)(1)(B) (listing factors that a court may consider in determining bad faith intent). Only the first factor is supported here. As discussed above, plaintiffs establish willfulness, but plaintiffs do not establish use of false contact information or evidence of serial cybersquatting on "other" parties. There is no evidence of contempt towards court proceedings on the part of the defendants. Accordingly, the Court recommends statutory damages in the amount of $25,000 for the single cybersquatting violation.

## IV. Conclusion

It is hereby ORDERD that defendant Goel's filing docketed as a motion to dismiss is CONSTRUED as an opposition to the entry of default judgment. It is further RECOMMENDED THAT:

1. Plaintiffs' motion for default judgment (ECF No. 15) be DENIED as to individual defendant Manoj Goel but GRANTED as to Pionera, Inc.;

2. The court enter judgment against Pionera, Inc. on the complaint's claims of trademark infringement (15 U.S.C. § 1114(1)), and cybersquatting (15 U.S.C. § 1117(d));

3. The court enjoin Pionera, Inc., and all persons acting by, through, or in concert with the defendant, from using plaintiffs' trademarks in any manner; and

4. The court grant plaintiff's request for statutory damages against Pionera, Inc. in the amount of $425,000.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(1). Within twenty one days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties. Id.; see also Local Rule 304(b). Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." Any response to the objections shall be filed with the court and served on all parties within fourteen days after service of the objections. Local Rule 304(d). Failure to file

objections within the specified time may waive the right to appeal the District Court's order. Turner v. Duncan, 158 F.3d 449, 455 (9th Cir. 1998); Martinez v. Ylst, 951 F.2d 1153, 1156-57 (9th Cir. 1991).

DATED: July 7, 2023

/s/ Allison Claire
ALLISON CLAIRE
UNITED STATES MAGISTRATE JUDGE